



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed July 13, 2022

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEXAS E&P OPERATING, INC. | § | CASE NO. 17-34386-SGJ-7 |
| | § | (CHAPTER 7) |
| DEBTOR. | § | |
| _____ | § | |
| ROBERT YAQUINTO, JR., | § | |
| AS CHAPTER 7 TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | ADVERSARY NO. 19-03226-SGJ |
| | § | |
| VS. | § | |
| | § | |
| CBS RADIO, INC. D/B/A CBS RADIO | § | |
| TEXAS, CBS CORPORATION, AND | § | |
| ENTERCOM COMMUNICATIONS | § | |
| CORP., | § | |
| | § | |
| DEFENDANTS. | § | |

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING DEFENDANTS' RULE 52(C) MOTION FOR JUDGMENT ON PARTIAL FINDINGS

## I.     INTRODUCTION

The above-referenced adversary proceeding ("Adversary Proceeding") is related to the Chapter 7 bankruptcy case of Texas E&P Operating, Inc. (the "Debtor")—a defunct energy company that was wholly owned by an individual named Mark Plummer ("Mr. Plummer"). Mr. Plummer has been accused of various wrongdoing over the years, including allegedly defrauding investors. The Chapter 7 trustee, Robert Yaquinto, Jr., is Plaintiff (the "Trustee" or "Plaintiff").  The following media organizations are Defendants: CBS Radio, Inc. d/b/a CBS Radio Texas, ViacomCBS (f/k/a CBS Corporation), and Audacy, Inc. (f/k/a Entercom Communications Corp.) (collectively, the "Defendants").[1] The facts and theories in this Adversary Proceeding bring back memories of the now-infamous *Janvey v. Golf Channel, Inc.*[2] litigation which sprung  from the Allen Stanford Ponzi scheme receivership.  However, the Debtor here did not operate a Ponzi scheme, and the Trustee's theories and approach are slightly different than those pursued in the *Golf Channel* case.

The governing complaint (the "Amended Complaint"), filed July 14, 2020, sought: (1) avoidance of actual fraudulent transfers pursuant to Tex. Bus. & Com. Code § 24.005(a)(1) of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), (2) avoidance of constructive fraudulent transfers pursuant to Section 24.005(a)(2) of TUFTA, (3) avoidance of actual fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, (4) avoidance of constructive fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, (5) avoidance of preferential transfers pursuant to Section 547 of the Bankruptcy Code, (6) recovery of avoided transfers pursuant to Section 550(a) of the Bankruptcy Code, and (7) a tort cause of action for aiding, abetting, and/or participation in the allegedly fraudulent scheme(s) of Mr. Plummer.[3] The Trustee later chose to dismiss Counts (5)

---

[1] DE # 1. Note: all references herein to "DE # ___" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Adversary Proceeding. All references to "DE # ___ in the Bankruptcy Case" refer to the docket entry number at which a pleading appears in the docket maintained in the main bankruptcy case of Texas E&P Operating, Inc. (17-34386).
[2] 487 S.W.3d 560 (Tex. 2016).
[3] DE # 23.

and (7).[4] Thus, alleged fraudulent transfers (that were either made with actual fraudulent intent or that were allegedly constructively fraudulent) are all that is at issue now in this Adversary Proceeding. Additionally, the Trustee's Amended Complaint seeks his attorneys' fees and costs incurred in this action.

Defendants are the current and former owners of KRLD 1080, an AM radio station serving the Dallas market. In the four years prior to the Petition Date, it is stipulated that the Debtor purchased radio airtime and associated advertising services from KRLD, paying a total of $529,587.86 (the "Transfers"). Mr. Plummer used most of this paid airtime for an hour-long Saturday morning show called "Smart Oil & Gas," in which Mr. Plummer discussed market trends and the benefits of investing in oil and gas. Listeners who were interested in exploring investment opportunities with the various oil and gas vehicles being promoted by Mr. Plummer were invited to call a phone number that Mr. Plummer provided for more information.

The Debtor's exact role in Mr. Plummer's overall business enterprise was mostly (but not entirely) providing brokering and marketing services to the various joint ventures or other investment vehicles in which investors might participate. Numerous creditors and investors sued Mr. Plummer and his entities before the bankruptcy—with creditors claiming that they went unpaid for work in the oilfields the Debtor (or associated companies) operated, and investors complaining that they did not receive promised returns on their investments. Additionally, Mr. Plummer has been sanctioned by securities regulators for various misdeeds. Much of the investor litigation and regulatory actions involved other non-Debtor entities owned by Mr. Plummer. The Debtor is the only entity of Mr. Plummer's that is now in bankruptcy before this court.

---

[4] DE ## 91 & 93 (pertaining to Count (5)). The Trustee announced at trial on this matter his agreement to dismiss Count (7).

As noted, the Trustee contends that the payments the Debtor made to KRLD for airtime should be avoided as actual and constructive fraudulent transfers under TUFTA and the Bankruptcy Code. The main points of contention are as follows: The Trustee contends that the Debtor was operating a ***fraudulent business scheme*** that should be deemed to constitute a "badge of fraud" which can, on its own, establish "actual intent to defraud" under TUFTA and the Bankruptcy Code (similar to the so-called "Ponzi-Scheme Presumption" the Fifth Circuit has recognized)[5] or, at a minimum, should be weighed ***with other*** "badges of fraud" to establish "actual intent." Moreover, the Trustee argues that Defendants cannot avail themselves of the "good faith and value" defenses under TUFTA and the Bankruptcy Code, because they ignored numerous "red flags" suggestive of fraudulent intent and the Debtor's insolvency at the time of the Transfers—such that the Defendants were on inquiry notice of these things.

Additionally, the Trustee contends that "reasonably equivalent value" was not received by the Debtor because the advertising paid for by the Debtor was used to promote investments in ***non-Debtor*** entities.

The Defendants argue that the Trustee has failed to assert badges of fraud that are sufficient to be used to infer actual intent. The Defendants also contend that the Transfers were not constructively fraudulent transfers under TUFTA or the Bankruptcy Code because the Defendants entered into contracts with the Debtor at arm's length and that were at market rates, which is sufficient to show reasonably equivalent value.[6]

The court held a four-day trial on January 18, 2022, through January 21, 2022. The trial consisted of testimony from eight witnesses and hundreds of exhibits.

---

[5] *See Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012) (and cases cited therein).
[6] *See Golf Channel*, 487 S.W.3d at 560.

On the last day of trial, the Defendants submitted *Defendants' Motion for Judgment on Partial Findings* pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.[7] Through the motion, the Defendants requested that the bankruptcy court rule that the Trustee had not met his burden on any claim in the Amended Complaint because: (1) a Ponzi-Scheme Like Presumption does not exist or apply here; (2) the remaining badges of fraud were insufficient to prove actual fraudulent intent; and (3) the Trustee did not show that the Debtor received less than "reasonably equivalent value in exchange"[8] for the Transfers to sustain his constructive fraudulent transfer claims. The Defendants' request, if granted, would mean that the bankruptcy court can essentially bypass any evaluation of the Defendants' defenses and simply grant a judgment under Rule 52(c). To be clear, the Defendants presented defenses to both actual and constructive fraud, including good faith, but argue that the court need not even address those defenses because the Trustee failed to prove basic elements of his causes of action. The court allowed post-trial briefing on these arguments.

The bankruptcy court has determined that, if a fraudulent business scheme existed here, it should be treated as just one badge of fraud to be weighed along with other badges of fraud, in order to assess whether "actual intent" to defraud existed (in other words, there is no Ponzi-Scheme-*Like* Presumption that exists). The bankruptcy court further determines that, although certain individuals at the Debtor engaged in improper conduct, the Debtor was not, *per se*, a fraudulent business scheme during the relationship with KRLD, and the other badges of fraud alleged by the Trustee (i.e., insolvency, existing litigation, and less than reasonably equivalent value) are not sufficient for the bankruptcy court to find "actual intent" so as to sustain the claims for actual fraudulent transfers under either TUFTA or the Bankruptcy Code. Further, the

---

[7] DE # 149.
[8] *See* Tex. Bus. & Com. Code § 24.005(a)(2); *see also* 11 U.S.C. § 548(a)(1)(B).

bankruptcy court has determined that the Trustee has not met his burden of showing the Debtor "received less than a reasonably equivalent value in exchange for" the Transfers made in exchange for the radio advertising. Specifically, the evidence showed the advertising contracts were negotiated at arm's length, reflected market rates, and the airtime focused on promoting the overall enterprise including the Debtor. Accordingly, the bankruptcy court ***grants*** the Defendants' Rule 52(c) motion for judgment on partial findings, and ***denies*** all relief requested by the Trustee.

## II.    JURISDICTION

The court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. Sections 157 and 1334. Venue is proper in this court pursuant to 28 U.S.C. Sections 1408 and 1409(a). This is a core proceeding under 28 U.S.C. Section 157(b)(2)(A), (F), (H), and (O). The parties have consented to the court entering final orders and judgments.

## III.    FINDINGS OF FACT

### A.    The Debtor, KRLD, and Related Advertising Activities

The Debtor, Texas E&P Operating, Inc., was a Texas corporation that, at all relevant times, was wholly owned by Mr. Plummer, who also acted as its president.[9] In addition to the Debtor, Mr. Plummer owned and controlled several other entities affiliated with the Debtor (the "Non-Debtor Affiliates"), including Texas E&P Partners, Inc. and Texas E&P Funding, Inc.[10]

Prior to January 7, 2016, the Debtor was known by a different name, Chestnut Exploration and Production, Inc.[11] Also, prior to January 7, 2016, Texas E&P Partners, Inc. was known as Chestnut Exploration Partners, Inc. and Texas E&P Funding, Inc. was known as Chestnut Exploration, Inc.[12]

---

[9] Joint Pretrial Order, DE # 146, ¶24.
[10] *Id,*
[11] *Id.*
[12] *Id.* at ¶ 25.

The business model for the Debtor included acting as a broker of interests in joint ventures in which Non-Debtor Affiliates acted as the managing venturer (or actual seller).[13] However, the Debtor also had its own assets and operations.

The Debtor's principal assets listed in its voluntary bankruptcy petition were oil and natural gas reserves located across eight oil fields in seven counties across three different states: (1) Calcasieu Parish, Louisiana; (2) Willacy County, Texas; (3) Jackson County, Texas; (4) Anderson County, Texas; (5) Gregg County, Texas; (6) Cherokee County, Texas; and (7) Lea County, New Mexico.[14] It appears the Debtor did, in fact, drill oil wells on certain of these fields, although evidence has not been presented on which fields and when the drilling occurred.

The Debtor's schedules listed accounts receivable of $2.988 million; crude oil inventory worth $60,000; oil field equipment worth $3.063 million; and mineral interests worth $12.546 million.[15] The Debtor's Statement of Financial Affairs reported $1.664 million of revenue in 2017 up through the November 29, 2017 petition date ("Petition Date") and $3.990 million of revenue in calendar year 2016.[16]

The Debtor's list of its 20 largest unsecured creditors was comprised of oil field goods or service providers shown to be owed over $2.835 million.[17] The Debtor's schedules also listed $6.290 million in secured claims, including $4.900 million owed to Prosperity Bank.[18] The Debtor's Statement of Financial Affairs reported that the Debtor paid Prosperity Bank $459,393.86 on its secured debt in the year preceding the bankruptcy case.[19]

---

[13] Trustee's Exhibit #12, p. 4.
[14] Trustee's Exhibit #1, p. 5.
[15] Trustee's Exhibit #2, pp. 6, 8, & 13-18.
[16] Trustee's Exhibit #3, p. 4.
[17] Trustee's Exhibit #1, pp. 8-10.
[18] Trustee's Exhibit #2, pp. 19-32.
[19] Trustee's Exhibit #3, p. 5.

From February 2015 to April 2017 (during which time the Debtor was advertising on KRLD), according to an SEC press release, the Debtor "raised" $6.1 million from retail investors by offering and selling interests in joint ventures formed to drill and operate two separate oil well projects.[20] Plummer spent $400,000 of these investor funds for improper personal or business expenses.[21] In an SEC suit filed on June 26, 2019, the SEC indicates that Plummer raised $6.1 million from investors for two wells in Anderson County, Texas and he spent approximately $5 million of those investor funds on allowable expenses such as lease acquisition, utilities, permits, and legal fees.[22]

KRLD is an AM radio station that broadcasts in the Dallas-Fort Worth market.[23] From December 2014 through the Petition Date, the Debtor was a customer of KRLD.[24] During this time, the Debtor and KRLD were parties to a series of contracts for the airing of the "Smart Oil & Gas" show, along with periodic short-form advertising spots and sponsorships promoting the show.[25] The Debtor was a "cash-in-advance" customer of KRLD, meaning that it had to make required payments under the contracts with KRLD before it could go on air.[26] This arrangement was not unusual for customers of KRLD.[27] The court finds all testimony to have been credible that the agreements between the Debtor and KRLD were entered into at arm's length and at market rates.[28]

---

[20] Trustee's Exhibit #15.
[21] *Id.*
[22] Trustee's Exhibit #16.
[23] Joint Pretrial Order, DE # 146, ¶22.
[24] *Id.* at ¶26.
[25] *Id.* at ¶27.
[26] Waterman Testimony, Tr. 551:1, 557:15-24; Pesina Testimony, Tr. 612:19-22.
[27] Pesina Testimony, Tr. 612:19-25; Waterman Testimony, Tr. 551:10-11.
[28] Waterman Testimony, Tr. 538:16-539:7, 559:2-8.

In the four years prior to the Petition Date, the Debtor made payments to KRLD totaling $529,587.86 (the "Transfers").[29] In the two years prior to the Petition Date, $282,000.36 of the Transfers were made.[30] These payments were all made by the Debtor pursuant to the KRLD contracts in exchange for the agreed upon airtime and promotional opportunities. The payments were made on a consistent basis over the entire four-year contractual relationship. The Debtor had some minor delinquencies and last-minute payments that required basic collection methods by KRLD, which was not uncommon in the business.[31] The Debtor never had any serious delinquencies regarding the contracts with KRLD.[32] The Debtor was insolvent at all relevant times during its relationship with KRLD.

Before Smart Oil & Gas began airing, Mr. Plummer informed Robert Waterman ("Mr. Waterman") and Samuel Johnson ("Mr. Johnson"), both employees of KRLD that oversaw the relationship with the Debtor, that he intended to drop his personal registration with the Financial Industry Regulatory Authority ("FINRA"), suggesting that this would enable him "to visit about more 'industry information' spots in branding Chestnut Exploration on CBS Radio."[33] Nothing in the record suggests that Mr. Waterman or Mr. Johnson found this disclosure suspicious. Whether or not there was any necessity to maintain the FINRA membership in relation to the Debtor's business has not been shown.

Smart Oil & Gas began airing in or around the Fall of 2015.[34] The show was informational in nature and covered topics about oil and gas.[35] During the show, Mr. Plummer would invite listeners interested in learning about potential investment opportunities in oil and gas to call an

---

[29] Joint Pretrial Order, DE # 146, ¶31.
[30] *Id.* at ¶32.
[31] Waterman Testimony, Tr. 558:13-23, 560:21-24.
[32] Pesina Testimony, Tr. 353:7-12.
[33] Trustee's Exhibit #62.
[34] Joint Pretrial Order, DE # 146, ¶28.
[35] *Id.* at ¶29.

800 phone number or visit a website.[36] Personnel of KRLD, including Mr. Waterman and Mr. Johnson, reviewed pre-recorded material associated with Mr. Plummer's marketing and advertising on KRLD to ensure compliance the applicable broadcasting standards.[37]

At the end of 2015, Mr. Plummer discontinued the "Chestnut" brand by which his entities were known and switched to the "Texas E&P" brand.[38] Additionally, Mr. Plummer began referring to himself on-air as "M.A. Plummer" instead of using his first name, Mark.[39] To justify the switch in brands to KRLD, Mr. Plummer claimed the "Texas E&P" brand would help "as we move our companies into Korean funding sources, it gives more meaning to our roots and base as we go global."[40] A year later, it appears Mr. Plummer began using the "Richmond Engineering" brand as a sponsor of Smart Oil & Gas.[41] The show always retained its Smart Oil & Gas name and same Saturday morning time slot throughout all of the branding changes.[42]

Both Mr. Waterman and Mr. Johnson credibly testified at trial that they thought the rebranding by Mr. Plummer of the Debtor was a bad idea (given the resources applied to the Chestnut brand), but it did not raise any red flags because other clients of KRLD had done the same thing in the past.[43] As far as Mr. Plummer's use of "M.A. Plummer," Mr. Waterman noted that "it didn't raise a big flag with me because his name was still Plummer. It wasn't like he was running and hiding and changing his name totally, so it didn't raise a flag with me."[44]

B. Mr. Plummer's Issues with Regulators, Investors, and Creditors

---

[36] *Id.*
[37] *Id.* at ¶31.
[38] Trustee's Exhibit #104.
[39] *Id.*
[40] *Id.*
[41] Trustee's Exhibit ##165 & 166.
[42] Johnson Testimony, Tr. 458:25-459:10, 474:11-476:2.
[43] Johnson Testimony, Tr. 406:22-407:3, 408:2-5, 461:21-462:7; Waterman Testimony, Tr. 540:20-23, 546:25-547:1.
[44] Waterman Testimony, Tr. 553:11-12.

Over the years, Mr. Plummer and his related entities had numerous issues with regulators, investors, and creditors regarding the oil and gas businesses.

On August 3, 2011—well before the Debtor began advertising on KRLD—*Forbes* published an article on its website that noted that investors had been making complaints regarding the lack of returns on their investments with Mr. Plummer's Chestnut entities.[45] The article went on to allege legal and regulatory action taken against Mr. Plummer prior to the publication of the article, but the court was not presented with evidence of such actions.

In 2012, the Texas State Securities Board (the "TSSB") issued a disciplinary order against Texas E&P Partners (a related non-Debtor, then known as Chestnut Exploration Partners), reprimanding it for its failure to enforce written supervisory procedures, namely, selling property in contravention of its private placement memorandum.[46] The order by the TSSB required disgorgement of $619,469.00 of profits of Texas E&P Partners and fined it an additional $50,000.[47]

On July 21, 2015, the FINRA Department of Enforcement filed a complaint to initiate a disciplinary proceeding against Texas E&P Partners (still Chestnut Exploration Partners at the time of the complaint) and Mr. Plummer.[48] On December 13, 2016, FINRA released its extended hearing panel decision which expelled Texas E&P Partners and Mr. Plummer from FINRA for providing a falsified document to FINRA during an investigation and providing misleading testimony about the falsified document.[49] Importantly, FINRA found that the Department of Enforcement failed to prove that Texas E&P Partners or Mr. Plummer made misrepresentations

---

[45] Trustee's Exhibit #17.
[46] Trustee's Exhibit #13.
[47] *Id.*
[48] Trustee's Exhibit #11.
[49] Trustee's Exhibit #12.

and omissions in connection with the sale of joint venture interests or that the firm unethically misused customer funds or otherwise acted unethically.[50]

During the four years prior to the Petition Date, the Debtor, certain Non-Debtor Affiliates, and Mr. Plummer were the target of numerous lawsuits and arbitration proceedings. Of the over 40 lawsuits against the Debtor or affiliated entities, of which this court took judicial notice, all but six of the lawsuits appear to have been brought by oilfield service providers.[51] The remaining six lawsuits appeared to have been brought by investors.

One investor lawsuit addressed specifically at trial was initiated by Michael Eberhardt ("Mr. Eberhardt"). Mr. Eberhardt testified at the trial that he obtained a default judgment against Mr. Plummer individually on February 25, 2019.[52] The lawsuit involved actions that occurred during the Debtor-KRLD relationship but was filed after the Petition Date. Mr. Eberhardt first heard the Smart Oil & Gas show around May 2016.[53] After hearing the show, Mr. Eberhardt called the phone number provided, asked for additional information, did his own research, and met with an associate of Mr. Plummer before investing in a joint venture managed by Mr. Plummer.[54] Mr. Eberhardt was told drilling of wells would commence in the fall of 2016 and that royalties from the wells should begin in December 2016.[55] When these actions did not occur, Mr. Eberhardt began reaching out to Mr. Plummer in 2017 asking for updates and voicing concerns.[56] Mr. Plummer responded with reassurances that drilling would begin, citing efforts to obtain permitting, and anticipating progress soon.[57] In relation to the wells in which Mr. Eberhardt invested, it appears

---

[50] *Id.*
[51] *See* Trustee's Exhibit #44 (provides a list of lawsuits initiated during the relevant time period before the Petition Date).
[52] Trustee's Exhibits ##213 & 214.
[53] Eberhardt Testimony, Tr. 88:12-15.
[54] Eberhardt Testimony, Tr. 89:20-25, 90:12-25, 130:1-13.
[55] Eberhardt Testimony, Tr. 94:4-11.
[56] Trustee's Exhibits ##226, 233, 235, 238, & 247.
[57] *See* Trustee's Exhibits ##227, 228, 234, 243, & 245.

the Debtor never obtained the permits required to drill the wells and the Trustee's expert, Patrick Merritt ("Mr. Merritt"), was unable to discern whether the Debtor had formally applied for the required permits from the Texas Railroad Commission.[58] Mr. Eberhardt then filed his lawsuit on October 19, 2018.[59]

On June 26, 2019, during the pendency of the Debtor's bankruptcy case, the Securities and Exchange Commission (the "SEC") filed a complaint against Mr. Plummer, personally, in the United States District Court for the Northern District of Texas.[60] In that complaint, the SEC alleged that Mr. Plummer had disseminated false and misleading offering materials to investors and misappropriated investor funds.[61] That lawsuit was settled by a consent judgment, which permanently enjoined Mr. Plummer from violating certain securities laws and regulations and ordered him to disgorge $399,011.19 in investor funds obtained, $33,007.93 in prejudgment interest, and $75,000 as a civil penalty.[62] The judgment stipulated that Mr. Plummer neither admitted nor denied the allegations against him, and there were no findings of fact made.[63]

On June 17, 2020, during the pendency of the Adversary Proceeding, the TSSB issued an Emergency Cease and Desist Order to Mr. Plummer, to certain Non-Debtor Affiliates, and to certain associates of Mr. Plummer—it also appears to include the Debtor, now going by the name Richmond Engineering, Inc.[64] The order found that these parties related to Mr. Plummer were "engaging in new illegal, deceptive, and fraudulent practices in connection with the offer of units

---

[58] *See* Merritt Testimony, Tr. 146:10-21.
[59] Trustee's Exhibit #213.
[60] Trustee's Exhibit #16 (*SEC v. Plummer*, No. 3:19-cv-1538).
[61] *Id.*
[62] Final Judgment, *SEC v. Plummer*, No. 3:19-cv-1538 (N.D. Tex.). DE # 6.
[63] *See id.*
[64] Trustee's Exhibit #14.

in a new oil and gas venture to Texans."[65] The order summarized Mr. Plummer's multiple run-ins with regulatory authorities, namely FINRA and the downfall of the Debtor in stating:

> Beginning in or around 2014 and continuing through the filing of the bankruptcy petition, the Texas E&P Group of Companies was "experiencing [a] complete economic meltdown" due to two expensive and unsuccessful oil wells in Anderson County, Texas, the expense of defending dozens of lawsuits filed by creditors and investors and the expulsion of Respondent Plummer from FINRA.[66]

The TSSB order required Plummer and his related parties to cease and desist from engaging in fraud in connection with offering any security for sale in Texas.[67]

The regulatory actions, except for possibly the TSSB cease and desist order, did not involve the Debtor directly, rather Mr. Plummer and Non-Debtor Affiliates. In any event, of the events presented above, only the *Forbes* website article and TSSB disciplinary order existed when the Debtor and KRLD initiated their contractual relationship in late 2014.

C. Insolvency of the Debtor During the Relevant Time Period

To prove the Debtor's insolvency, the Trustee offered the expert report and testimony of Jason Rae of Lain Faulkner ("Mr. Rae").[68] Mr. Rae credibly opined that the Debtor was insolvent from December 2014, when the first transfer to KRLD was made, through the Petition Date.[69] Mr. Rae based his opinion on three different tests for insolvency: (1) inability to pay debts as they become due, (2) insufficiency of capital, and (3) a balance sheet analysis.[70] The Defendants did not rebut the opinion of Mr. Rae and did not dispute that the Debtor was insolvent during the time period in which the Debtor made the Transfers.

---

[65] *Id.* at p. 3.
[66] *Id.* at p. 12.
[67] *Id.* at p. 21.
[68] Trustee's Exhibit #32.
[69] Rae Testimony, Tr. 287:24-288:2.
[70] Rae Testimony, Tr. 315:3-13.

Additionally, Mr. Rae noted that the Debtor's insolvency may have been tied to the general state of the oil market in the years leading up to the bankruptcy. Mr. Rae testified that "the oil and gas industry in the fall of 2014 suffered a severe downturn."[71] In 2016, Mr. Plummer indicated to KRLD that he might have to discontinue the Smart Oil & Gas show.[72] In an email to Mr. Waterman, Mr. Plummer indicated that this suspension of the show would continue until "the price of oil recovers."[73] Mr. Plummer also indicated that he had "new covenants with [his] bank and they will not allow the expenditure till [sic] the oil price and corresponding cash flow improves."[74] There is no evidence that the Smart Oil & Gas show was ever discontinued by Mr. Plummer for these reasons.

### D. The Texas E&P Bankruptcy Case

On November 29, 2017, the Debtor filed its voluntary petition under Chapter 11. On January 17, 2018, this court entered an order requiring the United States Trustee to appoint a Chapter 11 Trustee in the case.[75] The United States Trustee appointed Jason R. Searcy to serve as Chapter 11 Trustee and the bankruptcy court entered an order approving his appointment on January 19, 2018.[76] On July 27, 2018, the bankruptcy court entered an order converting the case to Chapter 7.[77] On January 23, 2019, the bankruptcy court appointed Robert Yaquinto, Jr. as successor Chapter 7 Trustee after the sudden death of Mr. Searcy.

In total, the Debtor listed 306 general unsecured creditors, the vast majority of which were oil field vendors.[78] A total of 168 creditors filed proofs of claims, aggregating more than $30.3

---

[71] Rae Testimony, Tr. 289:22-23.
[72] Trustee's Exhibit #144.
[73] *Id.*
[74] *Id.*
[75] DE # 83 in the Bankruptcy Case.
[76] DE # 90 in the Bankruptcy Case.
[77] DE # 209 in the Bankruptcy Case.
[78] *See* Trustee's Exhibit #2, pp. 56-99.

million in amount, and the majority appeared to be trade creditors.[79] During the bankruptcy case, the Trustee sold various mineral interests owned by the Debtor to different buyers for an approximate sale price of $681,000.[80]

## IV.    CONCLUSIONS OF LAW

### A.    The Rule 52(c) Standard

Under Rule 52(c) of the Federal Rules of Civil Procedure: "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Rule 52(c), unlike Rule 50, does not require the bankruptcy court "to draw any inferences in favor of the non-moving party" and permits the court to make a determination "in accordance with its own view of the evidence."[81] On appeal of a judgment entered pursuant to Federal Rule of Civil Procedure 52(c), findings of fact are reviewed for clear error and conclusions of law de novo.[82]

### B.    Actual Fraudulent Transfers under TUFTA and the Bankruptcy Code

Section 24.005(a)(1) of TUFTA provides the statutory authority under Texas law to enable avoidance of an actual fraudulent transfer. The statute provides that an actual fraudulent transfer occurs when a transfer is made "with actual intent to hinder, delay, or defraud any creditor of the debtor."[83] Whether a transfer was made with actual fraudulent intent is a fact question.[84] Given that direct evidence of actual intent is rarely available, courts typically rely on circumstantial

---

[79] Trustee's Exhibit #4.
[80] Trustee's Exhibit #8.
[81] *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 n.1 (5th Cir. 2011) (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).
[82] *EOG Res., Inc. v. Chesapeake Energy Corp.*, 605 F.3d 260, 264 (5th Cir. 2010).
[83] Tex. Bus. & Com. Code § 24.005(a)(1).
[84] *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App. 2007).

evidence, known as badges of fraud, to infer intent.[85] TUFTA provides a non-exclusive list of badges of fraud that may be considered to find actual intent on the part of a debtor.[86] The badges of fraud listed in the statute include:

(1) the transfer or obligation was to an insider;
(2) the retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all of the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[87]

Similar to TUFTA, Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to avoid a transfer when a debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." Unlike TUFTA, the Bankruptcy Code does not set forth badges of fraud in the statute. However, the Fifth Circuit has identified similar badges of fraud that may serve as evidence that a transfer was made with actual intent to defraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to

---

[85] *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).
[86] *See* Tex. Bus. & Com. Code § 24.005(b) (stating "consideration may be given, **among other factors**, to" the listed badges of fraud) (emphasis added).
[87] *Id.*

be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.[88]

Because the list is non-exhaustive, a court may consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.[89] There is no clear authority on how many badges of fraud must be present to sufficiently establish actual intent under either TUFTA or the Bankruptcy Code. [90] As a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one "badge of fraud."[91] "While a badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute a fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable."[92] "Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud."[93] Courts in Texas have struggled somewhat regarding how many badges of fraud must exist to establish actual intent to defraud, although generally two or three badges of fraud is regarded as insufficient.[94] Courts "must consider all the factors and the 'totality' of the circumstances."[95]

> i.    The Ponzi-Scheme Presumption, Ponzi-Like Schemes, and Treatment of Fraudulent Business Schemes

---

[88] *Soza*, 542 F.3d at 1067.

[89] *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 (Bankr. N.D. Tex. 2014).

[90] *Tow v. Speer*, Civ. Action No. H-11-3700, 2015 WL 1058080, *11 (S.D. Tex. 2015).

[91] *Ingalls v. SMTC Corp.* (*In re SMTC Mfg. of Tex.*), 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009).

[92] *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir.1981) (internal citations omitted).

[93] *Soza*, 542 F.3d at 1067 (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).

[94] *See, e.g.*, *1701 Commerce, LLC*, 511 B.R. at 841 (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *Ingalls*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent.); *Byman v. Denson* (*In re Edwards*), 537 B.R. 797, 808 (Bankr. S.D. Tex. 2015) (three badges of fraud not sufficient to prove actual intent under TUFTA); *Taylor v. Trevino*, No. 3:20-CV-393-D, 2021 WL 347566, at *3 (N.D. Tex. Feb. 2, 2021) (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent").

[95] *Tow*, 2015 WL 1058080, at *11.

A trustee can avoid the burden of proving actual fraudulent intent—or laboriously establishing different badges of fraud—in one situation identified by the Fifth Circuit: when there was a Ponzi scheme (the "Ponzi-Scheme Presumption"). The Fifth Circuit defined a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.[96] The Fifth Circuit has reasoned that a Ponzi scheme is, "as a matter of law, insolvent from its inception."[97] Generally, the Fifth Circuit has only applied the Ponzi-Scheme Presumption—meaning actual fraudulent intent is presumed, relieving a plaintiff from the usual burden of proof requirement--where it has expressly found the debtor or transferor operated a classic Ponzi scheme.[98] As recently stated by another judge in this district: "[A]n enterprise must meet the definition of a classic Ponzi scheme for the Ponzi-Scheme Presumption to apply."[99]

The Fifth Circuit, in *American Cancer Society v. Cook*, was faced with a collection of entities that, similar to the current case, sold securities in oil and gas drilling projects to investors.[100] The entities in that case published investment brochures that indicated 80% of proceeds from the offerings would be used on operational costs of the oil wells and 20% on management costs of the enterprise.[101] The entities ended up raising approximately $13.4 million from investors through multiple securities offerings.[102] However, large portions of the investor funds were sent to subsidiaries and executives of the company for personal expenses.[103] In that

---

[96] *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)).
[97] *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).
[98] *See Warfield*, 436 F.3d at 558–559; *Janvey v. Alguire*, 647 F.3d at 597–98; *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014); *Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007).
[99] *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *4 (Bankr. N.D. Tex. June 3, 2022).
[100] 675 F.3d 524, 526 (5th Cir. 2012).
[101] *Id.*
[102] *Id.*
[103] *Id.*

case, the receiver argued and the district court found that, while not a classic Ponzi scheme, the entities were run as a Ponzi-like scheme and transfers should be presumptively assumed to have been made with fraudulent intent.[104] The Fifth Circuit reversed the district court and found the receiver failed to produce evidence sufficient to show a classic Ponzi-scheme occurred to enable the Ponzi-Scheme Presumption to apply, since not all securities frauds are Ponzi schemes.[105] The court went on to state that the entities "may well have operated as a fraudulent or at least badly mismanaged drilling investment program," but the plaintiff failed to prove the fraud was a "traditional Ponzi scheme…based on the manufacturing of 'returns to investors from other investors' contributions.'"[106]

Subsequently, the Fifth Circuit restated its position in a subsequent case that sought to use the Ponzi-Scheme Presumption in the context of a preference under Section 547 of the Bankruptcy Code.[107] The Fifth Circuit there reasoned:

> The theory underlying the Ponzi exception to the ordinary course of business defense is that "Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)." ... Expanding this exception—as no other court, apparently, has done—to cover legitimate businesses in which there were some fraudulent or Ponzi-like transactions is inconsistent with this theory.[108]

Here, the Trustee does not contend that the Debtor was run as a classic Ponzi scheme or even a Ponzi-like scheme. Instead, the Trustee argues that the Debtor's business was a fraudulent business scheme and that this alone is enough to prove that all of the transfers of the Debtor were made with actual fraudulent intent.[109] Restated, the Trustee asks the bankruptcy court to treat the

---

[104] *Id.* at 527.
[105] *Id.* at 526.
[106] *Id.* at 528.
[107] *Templeton v. O'Chesky* (*In re Am. Hous. Found.*), 785 F.3d 143 (5th Cir. 2015).
[108] *Id.* at 161.
[109] Trustee's Response to Defendants' Motion for Judgment on Partial Findings, DE # 169, ¶10 ("Because Plummer was using the Debtor to perpetrate a fraudulent business scheme and the Transfers were in furtherance of that scheme, this by itself demonstrates that the Transfers were made with actual fraudulent intent.").

existence of a fraudulent business scheme as a badge of fraud—one sufficient on its own to find actual intent.

In making this argument, the Trustee relies heavily on a line of cases coming from the ruling of the United States Bankruptcy Court for the Southern District of Texas in *Smith v. Suarez (IFS Fin. Corp.)*.[110] That case involved a group of 19 debtors that were comprised of operating businesses offering insurance, mortgage, and banking services along with affiliated holding companies and off-shore investment vehicles.[111] "Even if IFS began as a legitimate enterprise, IFS's officers eventually concluded that it had no hope of honoring its commitments to investors. IFS orchestrated a series of fraudulent inter-company loans to distort its balance sheets and solicited new investments to pay-off old investments. By 1998, IFS's transfers were made solely to keep the fraudulent scheme going."[112] The bankruptcy court found that actual intent was present and "evidenced by the condition of the enterprise."[113] Further, the bankruptcy court went on to state that: "Under Supreme Court and Fifth Circuit Precedent, the existence of a pervasive fraudulent scheme is persuasive to find fraudulent intent with respect to transfers made in furtherance of that scheme."[114] This language arguably seemed to expand the Ponzi-Scheme Presumption to any fraudulent business scheme. However, if one drills down on the facts, the debtors—while perhaps running a legitimate business at one time—seemingly ran the business as a Ponzi scheme by the time period that the relevant transfers were made.

In *IFS,* the district court affirmed the finding of actual intent by the bankruptcy court.[115] However, the district court made no mention of a presumption from a fraudulent business scheme

---

[110] 417 B.R. 419 (Bankr. S.D. Tex. 2009).
[111] *Id.* at 427.
[112] *Id.* at 428.
[113] *Id.*
[114] *Id.*
[115] *Smith v. Suarez (In re IFS Fin. Corp.)*, No. H-09-CV-3059, 2010 WL 11652027, at *9 (S.D. Tex. Sept. 11, 2010).

that could be used to establish fraudulent intent.[116] Instead, the district court went through a classic badge of fraud analysis under TUFTA and found four badges of fraud were present (i.e., transfers to insiders, litigation commenced against the debtors, transfers occurred after taking on a substantial debt, and concealment of assets). The district court found these badges were enough to infer actual intent but went no further.[117]

The Fifth Circuit in *IFS* affirmed the finding of actual intent of both the district court and bankruptcy court.[118] The Fifth Circuit also went through the classic badges of fraud analysis. The Fifth Circuit found numerous badges of fraud were present and sufficient to find actual intent.[119] The Fifth Circuit added "[e]vidence that a company operated as a fraudulent enterprise at the time of the transfer, moreover, may be sufficient to establish actual intent," but cited as support a previous opinion in which the Fifth Circuit had ruled that a ***traditional Ponzi scheme*** was sufficient to find actual intent.[120] The Fifth Circuit ended its analysis by stating "evidence that IFS operated as a fraudulent enterprise at the time of the transfers ***supports*** this finding of fraudulent intent" based on the badges of fraud.[121]

Recently, a comprehensive opinion on this issue was entered by Judge Robert L. Jones of this District in *In re Reagor-Dykes Motors, LP*.[122] In that case, the group of affiliated debtors ran an auto dealership that sold new and used motor vehicles. This was a top-performing dealership that had hundreds of millions of dollars in revenue.[123] The business, however, was unprofitable and was substantially undercapitalized which lead to the CFO committing numerous fraudulent

---

[116] *Id.* at *8-9.
[117] *Id.*
[118] *Stettner v. Smith, (In re IFS Fin. Corp.)*, 669 F.3d 255, 257 (5th Cir. 2012).
[119] *Id.* at 265.
[120] *Id.* (citing *SEC*, 487 F.3d at 301).
[121] *Id.* (emphasis added).
[122] 2022 WL 2046144.
[123] *Id.* at *1.

acts to raise funds needed to keep the debtors operating.[124] There, the court was faced with a summary judgment motion and determined that the trustee had presented sufficient evidence on multiple badges of fraud, including a fraudulent business scheme, to survive summary judgment on his actual fraudulent transfer claims. However, the court granted summary judgment as to the ***non-applicability of a Ponzi Scheme-Like Presumption***, concluding that there was, in fact, a legitimate business being run and, thus, no traditional Ponzi scheme.[125]

Importantly, the court in *Reagor-Dykes* addressed the decision in *IFS.* by both the bankruptcy court and Fifth Circuit. The court stated that, while the bankruptcy court may have found it acceptable to extend the Ponzi Scheme Presumption despite the fraudulent enterprise not being a classic Ponzi scheme, the Fifth Circuit's opinion cannot be interpreted to extend the presumption.[126] The court noted that the Fifth Circuit avoided any mention of a presumption and instead said evidence of a fraudulent scheme "may be sufficient to establish actual intent" and the existence of a fraudulent enterprise "supports" the finding of actual fraudulent intent that was already established from the badges of fraud.[127] The *Reagor-Dykes* court convincingly opined that the existence of a fraudulent business scheme should be treated ***only as another badge of fraud***.[128]

The court agrees with the reasoning stated in *Reagor-Dykes* and concludes that, if there is the existence of a fraudulent business scheme, it should only be treated as a badge of fraud to be weighed among other badges of fraud. There's no automatic Ponzi Scheme-Like presumption from this alone so as to infer "actual intent" to defraud.

ii.    *The Existence of Badges of Fraud in the Current Case*

---

[124] *Id.*
[125] *Id.* at *7-9.
[126] *Id.* at *7.
[127] *Id.*
[128] *Id.*

The Trustee has alleged four badges of fraud in the current case: (1) a fraudulent business scheme; (2) insolvency of the Debtor; (3) pending litigation or the threat of litigation against the Debtor; and (4) less than reasonably equivalent value was exchanged. The court will start by considering if the "fraudulent business scheme" badge of fraud is present. In determining whether the Debtor was run as a fraudulent business scheme, the court must examine the nature of the Debtor's business operations.

The Trustee presented evidence that there were numerous regulatory orders over an eight-year period that addressed misconduct of Mr. Plummer in particular, such as self-dealing and other fraudulent practices. Additionally, at least three oil wells were never drilled for which investments were collected, and the Debtor raised funds that were used for improper personal or business expenses by Mr. Plummer. Certainly, the bankruptcy court can find that the Debtor and/or Mr. Plummer committed improper, or even fraudulent acts, while running the business. However, the presence of a handful of improper or fraudulent acts do not turn the Debtor into a fraudulent business scheme, *per se*, if the Debtor was otherwise running a real business.

As previously noted, the Debtor had interests in eight different oil fields. The Debtor's schedules listed accounts receivable of $2.988 million; crude oil inventory worth $60,000; oil field equipment worth $3.063 million; and mineral interests worth $12.546 million. The Debtor's Statement of Financial Affairs reported $1.664 million of revenue in 2017 up through the Petition Date and $3.990 million of revenue in calendar year 2016. The Debtor's Statement of Financial Affairs reported that the Debtor paid Prosperity Bank $459,393.86 on its secured debt in the year preceding the bankruptcy case. One of the leasehold interests was sold for $481,000 during the pendency of the bankruptcy case—certainly not a *de minimis* amount. All of this shows the Debtor had real revenue and assets that were part of a real oil and gas business. This is similar to the

*Reagor-Dykes* case where there was a real business, but there happened to be a CFO and others committing numerous fraudulent acts to keep the debtors operating.

There was insufficient evidence here to establish that Texas E&P had devolved into nothing more than a fraudulent business with no hope or intentions of drilling their way back to a viable enterprise. The Trustee presented a list of over 40 lawsuits in which the Debtor was named. Of those lawsuits, only six of them appeared to be lawsuits brought by disgruntled investors. The rest of the lawsuits appeared to be brought by trade creditors that were engaged to help develop, drill, and maintain the oil fields and wells in which the Debtor was involved. Indeed, almost the entirety of the proofs of claims filed in the Debtor's bankruptcy case were filed by trade creditors of the Debtor.

According to an SEC press release submitted by the Trustee, from February 2015 to April 2017 (during which the Debtor was advertising on KRLD radio), the Debtor raised $6.1 million for the drilling of two oil wells. According to that press release, of that $6.1 million, Mr. Plummer spent $400,000 on improper personal or business expenses. Those same facts are alleged in a complaint filed by the SEC against Mr. Plummer in 2019. In that complaint, the SEC admits that, of the $6.1 million, approximately $5 million of the money was spent on allowable expenses— such as lease acquisitions, utilities, legal fees, and drilling permits.

In summary, the evidence showed that Mr. Plummer, through the Debtor, committed numerous improper actions, some of which could be considered fraudulent. However, none of this rendered the legitimate business purpose of the Debtor moot or turned the Debtor into a fraudulent business scheme. The Debtor held significant assets, including receivables from crude oil and crude oil inventory. The Debtor spent a significant portion of its money on proper drilling expenses, accruing significant trade debt stemming from the drilling or attempted drilling of those

oil wells in the process. The Debtor was trying to run an oil and gas business and was unsuccessful in doing so. Despite the miscellaneous improper actions of the Debtor's principal, this did not all equate to a fraudulent business scheme. Thus, the court concludes that the fraudulent business scheme badge of fraud was not sufficiently proven by the Trustee.

As to the "insolvency" and "pending litigation" badges of fraud, it is undisputed that the Debtor was insolvent and had pending litigation against it when the Transfers were made. It is clear from the evidence, including the expert testimony of Jason Rae, that the Debtor was insolvent during the entirety of the Debtor-KRLD relationship and that over 40 lawsuits were filed against the Debtor. The Defendants point out that neither the Debtor's insolvency nor litigation pending against it stemmed from the Transfers to KRLD and no evidence has been provided to show such a connection.

The court does not believe it is necessary to address the relevance, or lack thereof, of a connection between each badge of fraud and the Transfers made to KRLD. The court concludes that the remaining three badges of fraud—insolvency, pending litigation, and reasonably equivalent value, if proven—are insufficient to establish actual fraudulent intent. Insolvency and pending litigation are two of the least probative badges of fraud, as they are present in the majority of bankruptcy cases. The most probative of potential badges of fraud that the Trustee has alleged— "less than reasonably equivalent value"—is lacking here, as further discussed in the section below. As noted earlier, most courts hold that two or three badges of fraud are insufficient for a plaintiff to carry his burden on actual intent.[129]

---

[129] *See, e.g.*, *1701 Commerce, LLC*, 511 B.R. at 841 (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *Ingalls*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent.); *In re Edwards*, 537 B.R. at 808 (three badges of fraud not sufficient to prove actual intent under TUFTA); *Taylor*, 2021 WL 347566, at *3 (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent").

Finally, the totality of the circumstances surrounding the Debtor's business demonstrates that the Debtor's advertising on KRLD was not made with the intent to keep the funds transferred to KRLD from other creditors. Rather, the Transfers paid for airtime to potentially access additional investors for capital to fund operations of the Debtor and Non-Debtor Affiliates— unfortunately those operations were highly unsuccessful. In summary, the court concludes that the Trustee did not prove the Transfers were made with actual fraudulent intent and, thus, cannot succeed on the actual fraudulent transfer claims under TUFTA and the Bankruptcy Code. The court need not analyze the affirmative defenses raised by the Defendants because actual fraudulent intent has not been established.

C.  Constructive Fraudulent Transfers under TUFTA and the Bankruptcy Code

The Trustee also asserted constructive fraudulent transfer claims under TUFTA Section 24.005(a)(2) and Bankruptcy Code Section 548(a)(1)(B). Under Section 24.005(a)(2) of TUFTA, to prove constructive fraudulent intent, the Trustee must show that the transfers were made by the Debtor:

> (2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[130]

Similarly, under Section 548(a)(1)(B) of the Bankruptcy Code, to show constructive fraudulent intent, the Trustee must prove the Debtor:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)

---

[130] Tex. Bus. & Com. Code § 24.005(a)(2).

(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[131]

The dispute as to the Trustee's constructive fraudulent transfer claims centers around the phrase "reasonably equivalent value" which appears in both TUFTA and the Bankruptcy Code. The Defendants have not challenged that the Transfers were not made by the Debtor to KRLD or that the Debtor was not insolvent when the Transfers were made. Instead, the Defendants contend that KRLD charged prescribed market rates for the radio advertising of the Debtor under contracts that were made at arm's length and KRLD provided all of the advertising for which the Debtor contracted. Thus, "reasonably equivalent value" was provided in exchange for the Transfers.

The Trustee does not dispute these facts as presented by the Defendants. Rather, the Trustee focuses on the language of TUFTA and the Bankruptcy Code that uses "reasonably equivalent value" only as it pertains to the value being received *by the Debtor*. The Trustee argues that the value provided by KRLD (i.e., the radio advertising) did not go *to the Debtor*. Specifically, the Trustee contends that the advertising on KRLD paid for by the Debtor was used to advertise and obtain investments in Non-Debtor Affiliates, and to benefit Mr. Plummer himself. The bankruptcy court was presented scripts and recordings of advertising spots used on KRLD that referred to Non-Debtor Affiliates.

---

[131] 11 U.S.C. § 548(a)(2)(B).

Under TUFTA, the "reasonably equivalent value" requirement is satisfied when the transferee fully performs in an arm's-length transaction in the ordinary course of its business at market rates.[132] Under the Bankruptcy Code, "'reasonably equivalent value' means that 'the debtor has received value that is substantially comparable to the worth of the transferred property.'"[133] The time to evaluate the equivalency of the transfers is at the time the transfer was made.[134] The burden to prove a lack of reasonably equivalent value falls on the Trustee or party challenging the transfer.[135]

The Texas Supreme Court, in analyzing TUFTA, determined "[w]hile the definitions of 'value' and 'reasonably equivalent value' are expansive and nonexclusive, there is nevertheless an implicit requirement that the transfer confer some direct or indirect economic benefit to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee."[136] The value inquiry may turn on whether the consideration provided to the debtor was illegal, but the value of services or goods provided to a debtor does not hinge on whether a debtor utilizes services or goods to further an illegal scheme or to pursue a legitimate business endeavor.[137] Moreover, the Fifth Circuit has recognized, in analyzing Section 548, that indirect benefits—such as synergy between two joining entities and increased monetary float— conferred from transfers at issue can be recognized

---

[132] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 582 (Tex. 2016).

[133] *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994)).

[134] *Golf Channel*, 487 S.W.3d at 569 ("[B]oth value and reasonable equivalency are determined as of the time of the transaction, not in hindsight."); *In re Hannover Corp.*, 310 F.3d 796, 802–03 (5th Cir. 2002) (value under Section 548 determined at the time of the transaction).

[135] *See In re McConnell*, 934 F.2d 662, 665 n.1 (5th Cir. 1991); *Altus Brands II, LLC v. Alexander*, 435 S.W.3d 432, 441 (Tex. App.—Dallas 2014, no pet.).

[136] *Golf Channel*, 487 S.W.3d at 574.

[137] *Id.* at 581.

to serve as "value" to a debtor.[138] Thus, the benefit of an obligation paid for by a debtor need not confer a direct benefit on the debtor.

Here, the bankruptcy court concludes that the Trustee did not meet his burden of showing that the Transfers made to KRLD for advertising did not provide reasonably equivalent value to the Debtor. The evidence showed that the Debtor was one of several entities that each served a role in the oil and gas business created by Mr. Plummer. The business model was (for the most part) for the Debtor to act as a broker for the joint ventures in which Non-Debtor Affiliates would serve as managers. It is unclear how money flowed between the Debtor and Non-Debtor Affiliates, but the advertising resulted in the sale of interests in oilfields in which the Debtor held leasehold interests. The Debtor was the recipient of millions in revenue on a yearly basis stemming from the oil and gas businesses. The investment capital gave the Debtor enterprise the potential to drill wells on those oilfields (albeit unsuccessfully frequently) and to acquire crude oil. The Debtor and Non-Debtor Affiliates worked in concert and each role served by one of the entities provided value to all of the entities involved. The Trustee has not provided evidence that the Debtor did not in some way benefit from the sale of joint venture interests in its enterprise or that revenue did not flow to the Debtor from these interests advertised on KRLD. The court had no way to put a dollar amount on the indirect benefit the advertising provided to the Debtor. In the absence of any evidence to the contrary, it seems apparent that the KRLD contracts were entered into at arm's length and at market rates and the investments generated from those advertisements indirectly benefited the Debtor. Accordingly, the court concludes that the Trustee has not met his burden in showing the transfers to KRLD were not for "reasonably equivalent value" to the Debtor.

D. The Section 550 Turnover Claim

---

[138] *Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1127 (5th Cir. 1993).

Section 550 of the Bankruptcy Code allows a trustee to recover the property of any transfer avoided under Sections 544, 545, 547, 548, 549, 553(b), or 724(a).[139] The success of a claim under Section 550 is dependent on the success of the underlying claim seeking to avoid a transfer—here, actual and constructive fraudulent transfer claims. Because the court has determined that the Trustee did not meet his burden of showing an avoidable actual or constructive fraudulent transfer, the turnover action cannot be sustained.

## IV.    CONCLUSION

As stated above, the court finds and concludes that there is no "Ponzi Scheme-Like Presumption" (such that there would be an automatic presumption of actual fraud) that applies outside the context of a classic Ponzi scheme.  The presence of an overall fraudulent business scheme might be considered as ***one badge of fraud***—one which might be weighed ***among other badges of fraud*** in an "actual fraud" cause of action of action under TUFTA or Section 548. However, the court finds and concludes that the Debtor (while engaging in several improper acts) was not run as an overall fraudulent business scheme. There was a real business; there were simply bad acts of certain actors, including Mr. Plummer. Moreover, as further addressed below, the badge of fraud of "less than reasonably equivalent value" was also lacking. The remaining badges of fraud alleged by the Trustee—(1) insolvency and (2) pending litigation against the Debtor—are insufficient here to establish "actual intent." Thus, the Trustee cannot show "actual intent" to sustain his claims for actual fraudulent transfers under both TUFTA and the Bankruptcy Code.

The claims for constructive fraudulent transfers under TUFTA and the Bankruptcy Code also fail. The Trustee failed to meet his burden in showing the transfers to the Debtor were made

---

[139] 11 U.S.C. § 550.

for less than "reasonably equivalent value," as the contracts with KRLD were entered into at arm's length, at market rates, and conferred at least some indirect benefit on the Debtor.

The turnover claim, accordingly, also fails because it cannot be sustained without establishment of an avoidable transfers.

For these reasons, the court **_grants_** the Defendants' Rule 52(c) motion for judgment on partial findings and will enter a judgment in favor of the Defendants, denying all relief requested by the Trustee. Defendants shall forthwith submit a separate Judgment consistent with this ruling.

**\* \* \* \* END OF FINDINGS OF FACT, CONCLUSION OF LAW, AND ORDER \* \* \* \***